## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

**LOUIS JOHN WOLVERTON**
209 Thrush Court
Bushkill, PA 18324

        *Plaintiff*,

        **vs.**

**MIA GRAY PADGETT-PATTERSON**
43 Melville Lane
Willingboro, New Jersey 08046-2910

        *Defendant.*

NO. _____

CIVIL ACTION

JURY TRIAL DEMANDED

### COMPLAINT

Plaintiff, by and through undersigned counsel, hereby files the following Complaint against Defendant:

### I.  INTRODUCTION

1.  Plaintiff, Louis John Wolverton, (hereinafter "Plaintiff" or "Wolverton"), brings this action against Mia Gray Padgett-Patterson (hereinafter "Defendant") for defamation and invasion of privacy.

### II.  JURISDICTION AND VENUE

2.  All of the allegations contained in the foregoing paragraphs of this Complaint are incorporated by reference herein as if the same were set forth at length.

3.   The Court may properly maintain personal jurisdiction over Defendant because Defendant's contacts with this state and this judicial district are sufficient for the exercise of jurisdiction over Defendant to comply with traditional notions of fair play and substantial justice, satisfying the standard set forth by the United States Supreme Court in International Shoe Co. v. Washington, 326 U.S. 310 (1945) and its progeny.

4.   The United States District Court for the Eastern District of Pennsylvania has jurisdiction over this action pursuant to 28 U.S.C. §1332 (a) (1), in that this is a civil action between a citizen of Pennsylvania and a citizen of New Jersey and the amount in controversy exceeds $75,000, exclusive of interest and costs.

5.   The Court may also maintain supplemental jurisdiction over the state law claims set forth herein pursuant to 28 U.S.C. § 1367(a) and Rule 18(a) of the Federal Rules of Civil Procedure because they are sufficiently related to one or more claims within the Court's original jurisdiction in that they form part of the same case or controversy.

6.   Venue is properly laid in the Eastern District of Pennsylvania pursuant to 28 U.S.C. §§ 1391(b)(1) and 1391(b)(2) in that a substantial part of the underlying conduct took place in this forum, in that persons who know the Plaintiff and read the published material, understood it to be defamatory and applicable to the Plaintiff and consequently, Plaintiff's reputational damage and pain and suffering occurred primarily this District.

### III.   <u>PARTIES</u>

7.   All of the allegations contained in the foregoing paragraphs of this Complaint are incorporated by reference herein as if the same were set forth at length.

8.  Louis John Wolverton, is a 22-year-old citizen of the Commonwealth of Pennsylvania who was employed as a lifeguard at Shawnee Village Windham Resorts, during the relevant time of this case

9.  Mia Gray Padgett-Patterson, the Defendant, is a citizen of the State of New Jersey, who resides at the above address.

## IV.   **FACTUAL BACKGROUND**

10.  All of the allegations contained in the foregoing paragraphs of this Complaint are incorporated by reference herein as if the same were set forth at length.

11.  At around 6:30 PM, on July 18, 2020, at the Windham's Shawnee Village pool, lifeguard Jonathan Shanley ("Shanley.") began his 30-minute rotation in the lifeguard chair.

12.  There were 3 lifeguards on duty at the time, one of whom was seated in the guard chair. Another who was handling the gate and reservations and the third who was in the lifeguard shed rehydrating and cooling off in the air conditioning.

13.  During Jonathan Shanley's rotation, he noticed an African American family who had a child with them, aged  about 6 to 8 years old.

14.  Shanley observed that the child did not swim very well and was clinging to the wall at the deep end, where there the sign indicated it was 6 feet deep.

15.  Shanley was immediately aware that this child could not stand on the bottom of the pool.

16.  In accordance with protocol, and in such situations, Shanley politely asks the  parents to take the child into the shallow end.

17.  Shanley also tries to complement something the child does well but says that they need a bit more practice and that he personally, would feel better if they did it in the shallow end.

18.  The shallow end is separated from the deep end by a rope which floats on the water.

19.   As Shanley approached, he asked two other children and their parents to move over to the shallow end, for the same reasons previously described.

20.   They did so without a problem.

21.   Shanley then approached the family and requested them to kindly take their child over to the shallow end, since, the child seemed to have "a bit of trouble, swimming."

22.   The parents questioned him and were clearly unhappy, but they moved from the 6 feet depth to about 4 ½ feet deep.

23.   This is not the shallow end. The shallow end is clearly marked as 3 ½ feet at its maximum depth and is on the other side of the floating rope.

24.   Shanley decided that he would watch the child and would only intervene if there was a dangerous situation.

25.   The family, however, stared at him very long period of time which Shanley found threatening and caused him to be hesitant to say anything further.

26.   After this, Shanley respectfully requested 5 or 6 more children and their parents to leave the deep end, which they did without incident.

27.   Notably, the previous year, a child required CPR because he had got into difficulty in the deep end.

28.   It was the Plaintiff who had revived him.

29.   As a consequence of this incident, the lifeguards imposed a strict policy about moving children out of the deep end, if they did not appear to be solid swimmers.

30.   After asking about 6 children and their parents to move to the shallow end, Shanley continued to watch the child in 4 ½ feet of water.

31.   Meanwhile, this family still stared at Shanley, in a hostile manner.

32.   One of the family members smiled in his direction, and it became clear that he was the subject of their conversation.

33.   Shanley then saw that the child had become distressed and no members of the family had noticed.

34.   As Shanley prepared to enter the water, the child reached out and held on to the shoulders of an adult, who had his back to him.

35.   Although relieved, Shanley went around to the family for a second time and repeated that he noticed that the child was still having trouble swimming and he wanted him to go to the shallow end

36.   This time, Shanley emphasized "on the other side of the rope."

37.   The family members then questioned him in a hostile manner about why he had needed to ask them a second time.

38.   Shanley responded that he just noticed the child was having trouble swimming and probably needed a bit more practice and that should be done where it was safer, which was on the other side of the rope.

39.   While Shanley was explaining, the family tried to cut him off in midsentence.

40.   One male member of the family said "but you already told us this and we're watching him. Listen, let me explain something to you, we may not look educated to you, but I assure you, we know how to take care of our kid. What makes you think you can tell us what to do with our kid?"

41.   Shanley said that all he was trying to do was to keep their child safe.

42.   The family told him to get out of their face and laughed.

43.   One male member of the family, stopped in front of Shanley and asked, "what's the story?"

44.   Shanley replied, by giving this member an update.

45.   The member then defended Shanley to the family by saying, "he's just doing his job, relax."

46.   The member then turned to Shanley and told him he was a good man.

47.   At that point, the Plaintiff arrived to rotate Shanley out of the lifeguard chair.

48.   Shanley updated the Plaintiff on the child he had been watching and advised that the Plaintiff watch him also because his family had not moved him entirely out of the deep end.

49.   Shanley further advised the Plaintiff about some other swimmers he had noticed while on guard duty.

50.   Shanley started his desk duty at the front of the pool area at 7:00 PM.

51.   The family continued to stare at him for the entire 37 minutes he was at the desk.

52.   Another lifeguard, Sean Pickett, ("Pickett.") relieved Shanley at 7:40 PM and asked if the Plaintiff needed to be rotated.

53.   The Plaintiff said he was fine, since there was only 20 minutes left until the pool closed.

54.   Pickett, however, rotated Shanley to inside the lifeguard shed to get him out of sight of the family who had never stopped staring at him.

55.   At 8 o'clock, Plaintiff blew his whistle to announce that they were closing the pool.

56.   The Plaintiff went inside the lifeguard shed for a moment, to check on Shanley since he had appeared to be a little shaken by the incident.

57.   Plaintiff then exited the lifeguard shed and blew his whistle again and again announced they were closing, and everyone should please leave the pool.

58.   A minute or two later, all the family members started to yell at all of the lifeguards, but most pointedly at the Plaintiff.

59.   They insulted the character of all of the lifeguards and the Plaintiff responded, in a calm manner, "I'm sorry, sir, I would just like to ask you to leave."

60.   One man responded, "who the fuck are you to tell me to leave?!"

61.   The lifeguards, in answer, referenced their lifeguard shirts and said, "the pool is closing and we're the lifeguards."

62.   One of the men, in his early twenties, pointed to Plaintiff and then to Shanley and said, "so that's Louis and this is Johnny Boy."

63.   He then kept repeating "Johnny boy, Johnny boy, Johnny boy " as if committing it to memory.

64.   Picket was questioned and asked in a hostile manner whether he was the one who told them to 'get out of the fucking pool.'

65.   Picket responded that he had not been the one to close the pool or ask anyone to leave.

66.   Plaintiff was then asked, in a hostile manner he was the one who said, 'get out of the fucking pool' and the Plaintiff denied saying any such thing.

67.   Meanwhile, the women were off to the left said, "it's not worth it, let's go."

68.   Shanley pointed to the man still saying Johnny boy and told him that he had done nothing to him and had had no issue with him."

69.   One of the family members then called the lifeguards " a bunch of racists."

70.    Shanley said he was just trying to keep the child safe.

71.   The man who defended Shanley before then said, "these two men were just doing their job, but Louis what makes you think you can tell us to leave?"

72.   It was clear that they are confusing Shanley for Plaintiff.

73.   The man who had insulted Shanley and called him uneducated then said "listen, I just got done doing ten years and I don't mind going back; I'll call my boys down to smoke all of you motherfuckers."

74.   Shanley said, "we did nothing to you besides trying to keep your kid safe, and our job. I have to ask you to leave, sir."

75.   At this point, the family began to leave and shortly thereafter, security walked in and the lifeguards updated them.

76.   The lifeguards then closed the pool as usual for the night, locked up and headed upstairs to clock out and to brief the front desk on what had just happened.

77.   The lifeguards requested that a security detail be posted at the pool for the next day.

78.   The following morning, Shanley opened the pool at 7.30 am and he, once more, requested security at the pool gate.

79.   The front desk promised to send someone down, but never did.

80.   12.00 pm, the Plaintiff climbed on to the lifeguard stand while Shanley went in to the lifeguard shed to give his manager a report of the previous day's events.

81.   While Plaintiff was on the lifeguard stand, two members of the African-American family, from the day before, went directly past the front desk, without any reservation, and walked right up to the Plaintiff in the guard chair and started to take pictures of him and then a video.

82.   During the video, they yelled, "this is the man who said he wants to kill all the black people".

83.   Three hours later, the Plaintiff's picture was posted on Defendant's Facebook page.

84. The Defendant specifically stated, in her post that "this did not happen to me personally. I don't sit back and wait until it happens to me, because it can and will. So, we have reservations for Shawnee Resorts next weekend. I have family there. This weekend and he said, " I wish these BLACK PEOPLE WOULD GET THE "F" OUT THE POOL."

85. The posting specifically identified the Plaintiff by name and posted his photograph.

86. Defendant's post, labeling the Plaintiff a racist, went viral.

87. The Plaintiff was, very shortly after Defendant's posting online, threatened, vilified, and insulted by numerous persons.

88. Plaintiff's full name and his photograph while on the lifeguard stand,  was reposted countless times with a banner across his enlarged photograph, in block a capitals, allegedly quoting him as saying, "I HOPE THESE BLACK PEOPLE GET THE FUCK OUT OF THE POOL."

89. Underneath the banner was the Plaintiff's full name and the words 'Life Guard.'

90. The banner, Plaintiff's forgoing alleged quote and his color photograph was all part of Defendant's post.

91. Even after Defendant's Facebook post was compulsorily removed by Facebook, the Defendant protested online that the post should not have been removed.

92. Even with the post's removal by Facebook, he post was nonetheless reposted countless times.

93. Plaintiff  became and remained the immediate subject of online conversations, where his character was maligned, his life was threatened, and he was viciously insulted.

94. Plaintiff had to explain the entire circumstances in order to defend himself from severe disciplinary action by the University which had accepted him as a student.

95. The Plaintiff never made the racial slur and/or slurs Defendant accused him of.

96. The accusation that he did make such a slur, or words like it, is completely untrue.

97.  The Plaintiff has never uttered a racial slur.

98.  In fact, the Plaintiff has discussed with Shanley, who is Puerto Rican, many aspects of the racial injustice, facing African Americans and other minorities.

## COUNT I

## DEFAMATION

99.  Plaintiff incorporates by reference the allegations in the foregoing paragraphs.

100. The foregoing actions by Defendant entailed communications that were defamatory.

101. The foregoing actions by Defendant entailed communications which were publicized.

102. The foregoing actions by Defendant entailed communications that were about or applied to Plaintiff.

103. The intention of the Defendant was to accuse the Plaintiff of racism and single him out in public as a racist.

104. The foregoing actions by Defendant entailed communications that were understood by the recipients, including the Plaintiff , to have a meaning that was or is defamatory.

105. The foregoing actions by the Defendant entailed communications that resulted in special harm to the Plaintiff.

106. The foregoing actions by the defendant consisted of an abuse of any conditional privilege that may have applied (the existence of any such privilege being expressly denied).

## COUNT 11

## INVASION OF PRIVACY

107. The photograph of the Plaintiff, and the caption across it, reflects that the Plaintiff is a racist.

108. The photograph is, as a consequence, libelous.

109. The foregoing actions by constitute the intentional tort of defamation pursuant to 42 Pa. Cons. Stat. § 8343(a).

110. As a direct and proximate result of the foregoing conduct of Defendant, Plaintiff's reputation was damaged, possibly irreparably.

111. As a result of the foregoing conduct of Defendant, Plaintiff has sustained financial damages.

112. Plaintiff incorporates by reference the allegations in the foregoing paragraphs.

113. The photograph posted by the Defendant placed the Plaintiff in a false light in the public eye by falsely labeling him a racist.

114. The photograph identified the Plaintiff by name.

115. The photograph was reasonably understood, by those who viewed it, to refer to the Plaintiff.

116. The false light of being labeled a racist, would be highly offensive to any reasonable person.

117. The Defendant acted in reckless disregard as to the falsity of the publicized matter and the false light in which the Plaintiff would be placed.

WHEREFORE, the Plaintiff requests that;

A.      Defendant is to be permanently enjoined from defaming Plaintiff;

B.   Defendant is to compensate Plaintiff, reimburse Plaintiff and make Plaintiff whole for any and all pay and benefits Plaintiff would have received had it not been for Defendant's illegal actions, including but not limited to back pay, front pay, salary, pay increases, bonuses, medical and other benefits;

C.   Plaintiff is to be awarded actual damages, as well as damages for the pain, suffering and humiliation caused to him by Defendant's actions;

D   Plaintiff is to be awarded punitive damages as permitted by applicable law, in an amount believed by the Court or trier of fact to be appropriate to punish Defendant for its willful,

deliberate, malicious and outrageous conduct and to deter Defendant and others from engaging in such misconduct in the future;

E.   Plaintiff is to be accorded any and all other equitable and legal relief as the Court deems just, proper, and appropriate;

F.   Plaintiff is to be awarded the costs and expenses of this action and reasonable legal fees as provided by applicable federal and state law.

Respectfully submitted,

KOLMAN LAW P.C.

By: */s/ Timothy M. Kolman*
Timothy M. Kolman, Esq
Sarah A. Biscoe, Esquire
Attorneys for Plaintiff
414 Hulmeville Ave.
Penndel, PA 19047

Dated:  September 14, 2020